## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kirsten Valentine Cadieux, | File No: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Unum Life Insurance Company of America, | |
| Defendant. | |

For her Complaint, Plaintiff Kirsten Valentine Cadieux states and alleges as follows:

### JURISDICTION AND VENUE

1.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.*, and principles of federal common law developed thereunder.

2.      This Court has jurisdiction of this action pursuant to 29 U.S.C. §1132(e)(1), ERISA § 502(e)(1), and federal questions under 28 U.S.C. §1331.

3.      Venue is proper in this District under 29 U.S.C. §1132(e)(2), ERISA §502(e)(2), because the case involves an employee benefit plan administered in this District and Defendant may be found in this District.

### PARTIES

4.      Plaintiff Kirsten Valentine Cadieux, Ph.D. ("Dr. Cadieux"), resides in Minneapolis, Minnesota.

5.    Unum Life Insurance Company of America ("Unum") issued an insured group long-term disability policy, Policy Number 912866 002 ("LTD policy") to Dr. Cadieux's employer, Hamline University. At all relevant times in this matter, Unum was the claims administrator for and a fiduciary of the LTD policy.

6.    The LTD policy is an employee benefit plan governed by ERISA. Dr. Cadieux was a participant in the LTD policy at all relevant times.

## LTD POLICY PROVISIONS

7.    "Disabled" is defined under the LTD policy as when Unum determines that:

- You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

- You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 36 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

8.    "Regular Occupation" means the occupation you are routinely performing when disability begins. Unum will look at the claimant's occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

9.    "Limited" means what you cannot or are unable to do.

10.    "Material and Substantial Duties" means duties that:

- Are normally required for the performance of your regular occupation; and

- Cannot be reasonably omitted or modified.

11.    "Monthly Earnings" means your gross monthly income from your Employer, not including shift differential, in effect just prior to your date of disability. It includes your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan or flexible spending account. It does not include income received from commissions, bonuses, overtime pay, or any other extra compensation or income received from sources other than your Employer.

12.    If a claimant is disabled and working, Unum will pay as follows:

We will send you the monthly payment if you are disabled and your monthly **disability earnings**, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury.

If you are disabled and your monthly disability earnings are from 20% through 80% of your indexed monthly earnings, due to the same sickness or injury, Unum will figure your payments as follows:

During the first 12 months of payments, while working, your monthly payment will not be reduced as long as disability earnings plus the gross disability payment does not exceed 100% of indexed monthly earnings.

1. Add your monthly disability earnings to your gross disability payment.
2. Compare the answer in Item 1 to your indexed monthly earnings.

If the answer from Item 1 is less than or equal to 100% of your indexed monthly earnings, Unum will not further reduce your monthly payment.

If the answer from Item 1 is more than 100% of your indexed monthly earning, Unum will subtract the amount over 100% from your monthly payment.

13.     The LTD policy provides for a cost-of-living adjustment ("COLA") of 3% after the claimant has received one full year of payments beginning on the first anniversary of payments and each following anniversary not to exceed 10 anniversary adjustment periods while the claimant continues to receive payments for their disability. The maximum benefit period for Dr. Cadieux is her Social Security Normal Retirement Age.

14.     The monthly benefit for Dr. Cadieux is 66.67% of her monthly earnings to a maximum benefit of $10,000/month less any deductible sources of income and disability earnings.

15.     The LTD policy provides that the policyholder must provide Unum with the following on a regular basis:

- Information about employees:

  • Who are eligible to become insureds;
  • Whose amounts of coverage change; and/or
  • Whose coverage ends;

- Occupational information and any other information that may be required to manage a claim; and

- Any other information that may be reasonably required.

16.     The LTD policy provides that Unum will stop sending payments and the claimant's claim will end on the earliest of the following:

- During the first 36 months of payments, when you are able to work in your regular occupation on a **part-time basis** and you do not;

- After 36 months of payments, when are you able to work in any gainful occupation on a part-time basis and you do not;

- If you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;

\- The end of the maximum period of payment;

\- The date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;

\- The date you fail to submit proof of continuing disability;

\- After 12 months of payments if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits;

\- The date you die.

17.    "Gainful Occupation" means an occupation that is or can be expected to provide a claimant with an income within 12 months of their return to work, that exceeds 80% of the claimant's indexed monthly earnings, if they are working; or 60% of their indexed monthly earnings, if they are not working.

18.    "Layoff or Leave of Absence" means the claimant is temporarily absent from active employment for a period of time that has been agreed to in advance in writing by the Employer.

## **UNUM'S ADDITIONAL CLAIMS HANDLING OBLIGATIONS**

19.    On November 18, 2004, four substantially identical Regulatory Settlement Agreements ("RSA") were entered into among all Unum companies and the Department of Labor and the Chief Insurance Regulators of All States and the District of Columbia following a multi-state target market conduct examination of Unum's claim handling practices. The RSA required Unum to improve its claim handling practices among other obligations.

20.     In 2005, the RSA was amended to add more protections for claimants including requiring Unum to give significant weight to attending physicians' opinions and to fairly interpret and apply information from attending physicians. The amendment requires that in order to reject an attending physician's opinion, Unum must find that the attending physician's opinion "is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record."

21.     Unum also has a claims manual that sets out various policies on claims handling. Several policies address Unum's procedures for assessing a claimant's ability to perform the duties of his occupation, including evaluation of subjective symptoms, functional capacity, and occupational demands.

22.     The claims manual also requires claim evaluations to consider all available information, including both medical signs and subjective symptoms, when reaching a claim determination. Unum's Claims Manual also requires Unum to analyze a claimant's ability to perform their own or any occupation in terms of the claimant's specific medical restrictions and limitations as well as their specific material and substantial occupational duties.

## **FACTUAL ALLEGATIONS**

23.     Dr. Cadieux is an associate professor – anthropology at Hamline University. Dr. Cadieux's date of hire was July 1, 2015.

24.     Dr. Cadieux was involved in a motor vehicle accident on May 16, 2020, and was ultimately diagnosed with a traumatic brain injury.

6

25.    Dr. Cadieux scheduled an appointment to see her physician right after the accident, but the appointment had to be canceled due to damage to her car from the accident. The accident also occurred just before the George Floyd death and protests. Dr. Cadieux lived close to the area where the main protests occurred, making it difficult to drive in that area.

26.    Dr. Cadieux was hit from a vehicle from behind, hitting the left side of her car. The left side of her showed impact marks extending from the rear driver's side door to the front bumper, which was dislodged. Dr. Cadieux's vehicle, a very solid Volvo sedan, suffered damage to the engine mounts which had been broken and other structural damage that was unrepairable. Analysis of Dr. Cadieux's vehicle indicated an impact of significant force.

27.    At the time of the accident, Dr. Cadieux was disoriented and confused. At first, Dr. Cadieux thought she only had some whiplash and a headache.

28.    Dr. Cadieux contacted the University of Minnesota/Fairview Clinic and was informed that they were only seeing the most urgent cases because of the COVID lockdown at the time. Instead, Dr. Cadieux made an appointment with a physical therapist who she had seen previously.

29.    Dr. Cadieux had trouble getting her car fixed as the garage where she was supposed to have the car towed had been significantly damaged in the protests. She spent the next two weeks struggling with car repair, feeling headachy, and extraordinarily overwhelmed with all the extra noise which included constant helicopters and explosions from the protests. She had intermittent nausea and frequent bouts of rapid heart beating.

She saw flashing lights when her eyes were closed and a constant sense of moving visual artifacts when her eyes were open. Because it was a stressful time for everyone during COVID and the protests, Dr. Cadieux thought she was not coping well with a minor injury that would soon resolve.

30.     At the beginning of July 2020, Dr. Cadieux and her husband went to visit her parents in Massachusetts. After being away from the protests, she realized she was experiencing more severe problems. Dr. Cadieux rested and avoided normal activities while she was in Massachusetts. She also saw a physical therapist and massage therapist while there.

31.     At the recommendation of David Young, a licensed massage therapist in Massachusetts, Dr. Cadieux took a six-week Alexander Technique course when she returned to Minnesota. Lauren Hill of the Alexander Technique Studio informed Dr. Cadieux that she was exhibiting motor dysfunction which should be further evaluated.

32.     On August 21, 2020, Dr. Cadieux's primary care provider, David Macomber, M.D., completed an ADA accommodation form requested from Hamline University. Dr. Macomber indicated that Dr. Cadieux had an impairment of headaches and eye pain. Dr. Macomber also indicated that Dr. Cadieux needed accommodation of less screen computer time and decreased work activity.

33.     On August 21, 2020, Dr. Cadieux had an appointment with Dr. Macomber. Dr. Cadieux expressed concern about the amount of Zoom/computer time her job required given her continued symptoms. Dr. Macomber ordered an MRI. The MRI provided no

findings to explain Dr. Cadieux's right eye pain and headaches. Dr. Macomber referred her to neurology.

34.     Dr. Cadieux saw Neurologist Abby Metzler, M.D., on September 14, 2020. Dr. Metzler believed that Dr. Cadieux's symptoms were suggestive of post-concussion syndrome and recommended that she been seen in the Concussion Clinic.

35.     On September 21, 2020, Dr. Cadieux was evaluated by the Ophthalmology Department and was assessed with vestibulo-ocular dysfunction.

36.     Dr. Cadieux began her treatment at Hennepin Healthcare's TBI Clinic on October 15, 2020. She was assessed with mild traumatic brain injury. She was referred to physical therapy and audiology for her dizziness and balance issues, referred to occupational therapy ("OT") for her vision changes, referred to clinical psychology for her mood changes, and referred to speech therapy for her cognitive changes.

37.     For the academic year 2020/2021, Dr. Cadieux worked a reduced schedule at .7 full time equivalent. Hamline University approved FMLA for her reduced schedule and paid short-term disability benefits.

38.     On October 19, 2020, Dr. Cadieux saw a psychologist. The clinical summary states that Dr. Cadieux has functional impairments related to her occupational performance. It is noted that her vulnerabilities include a history of multiple TBIs.

39.     Dr. Cadieux saw Mary Logeais, M.D., Internal Medicine, on September 24, 2020. The diagnoses listed by Dr. Logeais included traumatic brain injury, without loss of consciousness, sequelae; mast cell disorder; other migraine without status migrainosus, not intractable; and chronic shoulder pain.

9

40. On October 15, 2020, Dr. Cadieux saw Michael Kasprzak, D.O., Physical Medicine and Rehabilitation.

41. Dr. Kasprzak's November 25, 2020, note reports that Dr. Cadieux's mother fell on her head at age 1½. Dr. Cadieux suffered significant laceration, requiring several layers of stitches. Dr. Cadieux had headaches as a teen, which improved in college. Dr. Kasprzak recommended that she start vision therapy.

42. Dr. Cadieux had a neurological rehabilitation evaluation on November 5, 2020. The impression of the evaluation states that Dr. Cadieux was experiencing physical, emotional, and cognitive symptoms of TBI that continued to persist. Dr. Cadieux endorsed difficulty tolerating screens while working. It was recommended that Dr. Cadieux participate in speech-language pathology treatment to implement cognitive compensatory strategies to better manage her symptoms and promote recovery.

43. On November 5, 2020, Dr. Cadieux had an initial evaluation in OT. Computer work was noted as a trigger for her symptoms. Dr. Cadieux demonstrated impairments in activity intolerance, attention, ocular motor function, and vergence skills and ambient visual processing impairments. Continued OT was recommended.

44. Dr. Cadieux's OT appointment on January 21, 2021, states that she has a hard time in the afternoon because she is working too much. Using a computer screen was noted to be still difficult.

45. On February 4, 2021, Dr. Cadieux was recertified for continued OT.

46. The OT note of February 19, 2021, states that Dr. Cadieux is completely overwhelmed by flickering on the computer screen. She had increased difficulty with

vergence tasks when trying to increase proprioception to what she was doing. She was profoundly sensitive to refresh rate.

47.    On May 4, 2021, Dr. Cadieux was reevaluated by OT. The clinical impression was that continued treatment was indicated. The note states that she has a poor tolerance of sound and busy, quiet environments.

48.    On August 20, 2021, Min Jeong Graf, TBI Clinic, provided the following work restrictions: (1) half-time appointments; (2) avoid LED lights; (3) no more than 2 hours of screen time; and (4) no more than 1 formal meeting per day.

49.    On August 25, 2021, Dr. Cadieux was evaluated by Behavioral Health and was diagnosed with anxiety disorder and depression.

50.    Dr. Cadieux was also told to stop bicycling, her usual commuting method, because of her dizziness and to set aside any tasks or roles that were not crucial for her to do. She found replacements for the two Directorships she held at Hamline University and stepped out of her role as President of the board of a non-profit she had started.

51.    Dr. Cadieux compared her course recordings from the spring 2020, before the accident, and the fall of 2020, and there were visible differences. Post-accident she frequently bit her lips unintentionally, garbled words, moved in jerky and spastic ways, and her right eyelid twitched visible.

52.    Hamline University's faculty policy states that the most important faculty development program is the sabbatical leave program. Hamline University provides for full-time faculty to take sabbatical leaves for the purpose of intensive scholarship, study, or artistic achievement. Hamline University's policy states that sabbatical leaves become

part of a faculty member's professional responsibilities. Full sabbaticals may be taken for an entire year at half pay or for one semester at full pay. Sabbatical leave must be approved by the Provost based upon the merits of the sabbatical proposal and the recommendation of the Dean of the College and the Planning and Development Committee.

53.    Prior to Dr. Cadieux becoming disabled, she applied for a sabbatical for the academic year 2021/2022. Her application was signed by the Department Program Chair and Administrative Head indicating the project had been discussed and appropriate plans had been made to cover necessary course offerings should the sabbatical be approved.

54.    Dr. Cadieux's sabbatical was approved prior to her disability for the academic year 2021/2022. Dr. Cadieux took her sabbatical.

55.    Dr. Cadieux had difficulty performing her duties at .7 FTE for the 2020/2021 academic year. The sabbatical for the 2021/2022 academic year at 50% pay allowed Dr. Cadieux more flexibility to manage her symptoms and it involved significantly less computer use.

56.    Dr. Cadieux continued to treat. On October 25, 2021, an OT note states that Dr. Cadieux demonstrates very poor localization divergence greater than convergence.

57.    On February 7, 2022, Dr. Kasprzak provided the following restrictions: avoid LED lighting; and recommended the following work accommodations: (1) allow more time for or delay for projects; (2) restriction of meetings to one per day; (3) allow for reduced workload by 50%; and (4) allow breaks as needed to control symptoms levels.

58.     On May 23, 2022, Dr. Kasprzak provided a work note, reiterating his restrictions on February 7, 2022. He stated that the restrictions and accommodations would be effective for the 2022 spring and fall academic year.

59.     Dr. Cadieux submitted her long-term disability claim on April 25, 2022. Dr. Cadieux was unaware that she could receive long-term disability benefits if she was working part-time.

60.     Dr. Kasprzak completed an Attending Physician Statement dated May 23, 2022. Dr. Kasprzak listed the physical restrictions and/or limitations as avoid LED lighting, allow for reduced workload by 50%, and allow breaks as needed to control exacerbation of symptoms.  He listed the diagnosis as post-concussion syndrome. Dr. Kasprzak also provided his workability note dated May 23, 2022, which included additional restrictions allowing more time for or delay for projects and restricting meetings to one per day.

61.     On July 19, 2022, Unum issued a letter denying Dr. Cadieux's claim. The letter states that Dr. Cadieux's claim is not approved because her physician, Dr. Macomber, agreed she was not precluded from performing the full-time demands of her occupation from August 21, 2020, through November 18, 2020, and beyond. The letter states that records indicated Dr. Cadieux was approved for family medical leave through May 7, 2021, and that she stopped working part-time on May 31, 2021, and, therefore, her long-term disability coverage would not have continued beyond June 30, 2021.

62.     Unum states that its vocational rehabilitation consultant determined that Dr. Cadieux's occupational duties are light work in the national economy requiring lifting, carrying, pushing, pulling 20 pounds occasionally, frequently up to 10 pounds, or

negligible amount constantly. Unum found that the duties also require frequent sitting and occasional standing and walking. Visual demands were considered frequent, near acuity, accommodation. The mental and cognitive demands included dealing with people, influencing people in their opinions, attitudes and judgments, directing, controlling, or planning activities of others, and making judgments and decisions.

63.    Unum did not explain to Dr. Cadieux what was needed to perfect her claim and why it was needed, as required by ERISA regulations. 29 CFR § 2560.503-1(g).

64.    Dr. Cadieux's counsel notified Unum that the claim file provided did not include the neuropsychological evaluation which Unum states was reviewed. The claim notes reflect that Dr. Cadieux asked how Unum obtained a copy of it, and she was informed that it was part of her records received. Plaintiff's counsel requested that Unum provide any records regarding the neuropsychological evaluation.

65.    On January 20, 2023, Unum responded stating it did not have a copy of the neuropsychological evaluation. Unum stated that it was aware that Dr. Cadieux had a neuropsychological evaluation because it was mentioned in the Attending Physician Statement.

66.    Dr. Cadieux submitted an appeal of Unum's denial on May 2, 2023. The appeal consisted of a detailed appeal letter, medical records, physician statements, medical literature, Dr. Cadieux's medical expenses related to her disability, and the Regulatory Settlement Agreement ("RSA") to which Unum is obligated and excerpts from Unum's Claims Manual.

67.     The appeal letter explained that Unum had misrepresented Dr. Macomber's opinion on Dr. Cadieux's ability to perform her occupational duties. Unum acknowledged that Dr. Macomber provided restrictions and limitations but chose to rely solely on Dr. Macomber's response to Unum's physician letter which incorrectly described Dr. Cadieux's occupational duties.

68.     The appeal letter argued that Unum was aware that Dr. Cadieux's claim was based primarily on difficulties using a computer, and that her occupation required constant use of her computer. Unum failed to analyze Dr. Cadieux's claim based on her specific material and substantial occupational duties.

69.     The appeal letter explained that Unum's physician letter to Dr. Macomber was inaccurate and misleading regarding Dr. Cadieux's care following her injury.

70.     The evidence shows that Dr. Cadieux was impacted by the car accident and did seek care over the summer months following her injury.

71.     The appeal letter explained that Unum's physician letter to Dr. Macomber incorrectly stated that her injury did not impact on her driving ability. The medical records reflect that Dr. Cadieux had difficulty with nighttime driving.

72.     The appeal letter explained that Unum's physician letter to Dr. Macomber failed to discuss the most relevant and supportive medical information.

73.     Although the letter to Dr. Macomber was sent by a family medicine physician, the only documented medical review in the record was done by an RN.

74.     The appeal letter explained that the RN's conclusions were nonsensical and that the RN failed to consider Dr. Cadieux's occupational duties, including significant computer use.

75.     The appeal letter explained that Unum's file included objective evidence supporting Dr. Cadieux's restrictions and limitations and that the restrictions and limitations provided by several providers was consistent with the substantial evidence in the record and consistent with medically acceptable medical standards.

76.     The appeal letter explained that Dr. Cadieux's symptoms are consistent with her diagnosis and medical history.

77.     The appeal letter argued that Unum's vocational analysis was flawed because there was no mention of computer usage. Unum's file acknowledged that Dr. Cadieux's work was 100% remote using Zoom and that her biggest struggle was screen time. Nevertheless, Unum did not address whether Dr. Cadieux's difficulty using screens limited her ability to perform the material and substantial duties of her occupation.

78.     The appeal letter pointed out that Unum has been criticized by the courts for not accurately defining a claimant's job duties.

79.     The appeal evidence included a copy of Unum's RSA and an amendment to the RSA. On November 18, 2004, Unum and three other related companies entered into a Regulatory Settlement Agreement with insurance regulators and the United States Department of Labor. The RSA required Unum to improve its claim handling practices.

80.    On October 3, 2005, Unum agreed to an amendment to the RSA. The amendment included the following factor relating to increased focus on policies relating to medical evidence:

> Giving significant weight to an attending physician's ("AP") opinion, if the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for an AP's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.

81.    The appeal evidence included excerpts from Unum's Claims Manual relating to the evaluation of subjective symptoms and functional capacity – occupational demands.

82.    The appeal included a letter from Dr. Macomber dated February 22, 2023. Dr. Macomber addressed his response to Unum's physician's letter, stating he did not understand the letter to be asking him to agree to anything contrary to the restrictions he had previously provided. Dr. Macomber states that Dr. Cadieux would continue to need restrictions on her screen and computer use for an extended period.

83.    The appeal evidence included a spreadsheet of Dr. Cadieux's medical expenses related to her injury, showing that she had extensive treatment for her post-concussion syndrome condition.

84.    The appeal evidence included a statement by David Young, LMT, stating that Dr. Cadieux was treated by him in the summer of 2020 with manual therapy.

85.    The appeal evidence included a personal statement of Colin DeYoung, Dr. Cadieux's spouse. Mr. DeYoung explains that every part of Dr. Cadieux's life has been

disrupted by her injury. Mr. DeYoung stated that Dr. Cadieux was not able to participate in many activities in the summer of 2020, such as sailing and bike riding.

86.     The appeal evidence included a personal statement of Dr. Cadieux addressing critical information that was overlooked by Unum. She provided more details about her accident and how it impacted her.

87.     The appeal evidence included a report from Mark Weisberg, Ph.D., clinical health psychologist, who had treated Dr. Cadieux since February 15, 2021, for headache, anxiety, emotional dysregulation, autonomic dysregulation, and symptoms of post-concussion syndrome. He stated that Dr. Cadieux's restrictions should be a maximum 50% work schedule, no more than one meeting per day, and no LED lights or screens.

88.     The appeal evidence included a work restriction note from Min Graf, Hennepin Health Care TBI Clinic, dated August 20, 2021. The work restrictions included half-time appointments, avoiding LED lights, no more than two hours of screen time, and no more than one formal meeting per day.

89.     The appeal evidence included medical records from Dr. Michael Kasprzak from February 27, 2022, to August 15, 2022. Dr. Kasprzak's February 7 note stated that overstimulation causes Dr. Cadieux fatigue and then she gets headaches as well as poor focus and concentration. Dr. Kasprzak's April 15 note states that LED lighting disrupts Dr. Cadieux's orientation and physical coordination and provokes emotional disturbance.

90.     The appeal evidence included medical records from Brian Roscoe, Psy.D. from August 25, 2021, to January 16, 2023. Mr. Roscoe worked with Dr. Cadieux to better manage her symptoms.

91.     The appeal evidence included a neuropsychological evaluation conducted by Eric Waldron, neuropsychologist, dated November 23, 2021. Dr. Waldron's report stated that he observed that Dr. Cadieux's thought processes were notable for distractibility and mild slowing. He stated that Dr. Cadieux was distracted by noises in the environment. Dr. Waldron's impressions from the raw data were that Dr. Cadieux demonstrated a pattern of mild non-specific weaknesses that could conceivably be seen as consistent with dysfunction of subcortical brain networks. Dr. Waldron's diagnoses were memory loss, concussion without coma, sequelae, other specified mental issues due to known physiological condition, major depressive disorder, recurrent episode, mild, anxiety.

92.     The appeal evidence included a medical record from Thuy Hoang-Tienor, M.D. dated June 17, 2021. Dr. Hoang-Tienor agreed that Dr. Cadieux's symptoms could provoke anxiety and that anxiety could aggravate her symptoms.

93.     The appeal evidence included a medical record from Min Graf, Hennepin Health Care TBI Clinic, dated August 20, 2021. Min Graf's treatment plan included continue to participate in TBI rehab therapy; continue to follow with neurologist for headaches; follow up with PT as needed for dizziness/balance; follow up with primary care for palpitation at rest; continue using energy management strategies for fatigue; follow with OD as needed for vision changes; continue with clinical psychology for mood changes; continue with speech language pathology as needed for cognitive changes; refer to explore vocational rehabilitation; provide accommodation letter for work; and refer to external sleep medicine for insomnia.

94.     The appeal evidence included a medical record from Thomas Henry, M.D., neurology, University of Minnesota Epilepsy Clinic dated August 28, 2021. Dr. Cadieux reported that she had had six concussions in her lifetime. Dr. Henry recommended neuropsychological testing.

95.     The appeal evidence included an assistive technology assessment from Courage Kenny Rehabilitation Institute dated November 21, 2022. Dr. Cadieux was provided with several recommendations to assist with her screen usage.

96.     The appeal evidence included medical records from Whole Family Chiropractic from November 28, 2022, to January 16, 2023.

97.     The appeal evidence included a medical record from Kyle Harvison, Ph.D., clinical neuropsychology, Courage Kenny Rehabilitation Institute dated January 12, 2023. Dr. Harvison's impression was that Dr. Cadieux had chronic post-traumatic symptoms following her motor vehicle accident and that her visual symptoms were the most debilitating.

98.     The appeal evidence included occupational therapy records from Family Achievement Center, Inc. from October 17, 2022, to December 12, 2022. The OT assessment stated that Dr. Cadieux demonstrates multiple significant differences in the way she was processing and responding to sensory information.

99.     The appeal evidence included medical records from Mark Weisburg, Ph.D. from February 15, 2021, to September 14, 2022.

100.    The appeal evidence included medical literature regarding post-concussion syndrome.

101.    On June 14, 2023, Unum sent new reviews on appeal. RN Jacqueline Ballback provided a summary of the appeal evidence.

102.    A medical review by David Marino, M.D., psychiatry, on behalf of Unum. Dr. Marino agreed that Dr. Macomber's restrictions and limitations appeared reasonable given the evidence of dysfunction described and that the restrictions and limitations would have precluded Dr. Cadieux from performing her occupational demands from August 21, 2020, through November 18, 2020 (the elimination period for the LTD policy) and from August 21, 2020, through May 20, 2020 (the elimination period for the life insurance policy). Dr. Marino stated that Dr. Cadieux received a significant degree of care during the period under review and consistently reported severe symptoms. Dr. Marino stated that the restrictions and limitations related specifically to Dr. Cadieux's ability to perform duties on a computer screen. Dr. Marino was not asked to provide an opinion for the period beyond those dates.

103.    Unum requested that Dr. Marino clarify the duration of supported restrictions and limitations.

104.    Dr. Marino provided a clarification on June 13, 2023. Dr. Marino stated that Dr. Cadieux went on sabbatical as of June 30, 2021, and, therefore, restrictions and limitations were supported up to June 29, 2021. Dr. Marino stated that it was unclear what restrictions and limitations Dr. Cadieux may have had during her sabbatical. Dr. Marino stated that starting on May 17, 2021, Dr. Cadieux received increasing recommendations to engage in psychiatric care which was not followed.

105.   Unum's review of the appeal did not include a new vocational review to address Dr. Cadieux's vocational arguments.

106.   Dr. Cadieux's counsel responded to Unum's new reviews on June 29, 2023. The response letter explained that Unum's position regarding Dr. Cadieux's continued eligibility for benefits while on sabbatical was incorrect. The response letter pointed out that Unum did not provide this as a reason in the initial denial letter. The response letter pointed out that the LTD policy did not address sabbatical leaves. The response letter stated that it was unclear the provision in the LTD policy to which Unum was relying upon.

107.   The response letter explained that Dr. Cadieux's coverage continued during her sabbatical leave.

108.   Dr. Cadieux's response included excerpts from Hamline University's Faculty Handbook discussing sabbatical leaves.

109.   The response letter explained that Dr. Cadieux received wages at one-half of her salary during her sabbatical. She also continued to receive benefits.

110.   The response letter explained that the medical records supported continued disability during the sabbatical period.

111.   The response letter argued that Dr. Marino's opinion appeared to have been impacted due to Unum's request to him stating "we need duration due to clmt's changing employment status over that period."

112.   The response letter argued that Unum relied only on a review by a psychiatrist even though Dr. Cadieux's disability is based primarily on her post-concussion syndrome.

113.    The response letter explained that Dr. Marino misconstrued the neuropsychological evaluation by Dr. Waldron in his opinion that the results of the neuropsychological evaluation demonstrated that mental health was favored over a residual brain injury.

114.    The response letter explained that Dr. Marino's opinion that Dr. Hoang-Tienor's report dated June 17, 2021, was inaccurate when he stated that Dr. Cadieux's visual changes were likely attributable to hypervigilance, a psychiatric symptom.

115.    The purpose of Dr. Cadieux's visit with Dr. Hoang-Tienor was to address seizure-like symptoms she had experienced. Dr. Hoang-Tienor referred Dr. Cadieux to Dr. Henry for further evaluation.

116.    The response letter explained Dr. Henry's impression that Dr. Cadieux's described episodes were highly consistent with syncope. Dr. Henry did not believe that Dr. Cadieux's visual and other symptoms represented epileptic seizures and recommended a neuropsychological evaluation, with a particular focus on higher-order visual processing and visual motor efficiency.

117.    The response letter explained that Dr. Marino misinterpreted Dr. Harvison's January 12, 2023, note in stating that Dr. Harvison opined that Dr. Cadieux's post-traumatic symptoms were psychiatric based. The response letter pointed out that neither Dr. Harvison nor any other provider diagnosed Dr. Cadieux with post-traumatic stress disorder.

118.    The response letter argued that there was no support for Dr. Marino's assertions that multiple providers thought Dr. Cadieux's symptoms were primarily psychiatric and that Dr. Cadieux did not seek mental health treatment. The response letter

pointed out that Dr. Marino did not discuss the medical records from Brian Roscoe, psychology, from Mark Weisberg, Ph.D., or records from Lindsay Schrieber, Ph.D.

119.    Unum sent new information on August 14, 2023. The new claim notes state that a full medical review was appropriate at that time. For the first time, Unum requested an opinion as to whether restrictions and limitations were supported for a physical condition beginning August 21, 2020, and beyond.

120.    The new information included an email from Chris Carlson, benefits administrator for Hamline University, to Unum providing Dr. Cadieux's sabbatical letter of intent and sabbatical application. The request by Unum for this information was not included in the new information.

121.    Unum previously sent a letter on July 24, 2023, stating it was refusing to give Dr. Cadieux additional time to provide additional medical records as she had requested.

122.    The July 24, 2023, letter also stated that the initial denial letter stated that Dr. Cadieux did not have LTD coverage beyond June 30, 2021. The initial denial letter did not discuss Unum's position that taking a sabbatical resulted in a loss of benefits.

123.    The medical review was conducted by Scott Norris, M.D., who provided a report on August 11, 2023. Dr. Norris concluded that multi-specialty evaluations and therapy were completed and did not identify a definitive brain injury or organic neurological condition to explain Dr. Cadieux's symptoms. Dr. Norris concluded that the medical evidence did not support that Dr. Cadieux was incapable of performing the physical and/or cognitive demands of her occupation for any period as of August 21, 2020, forward. Dr. Norris stated that the records indicate that Dr. Cadieux did not seek medical

care until August 21, 2020, which is incorrect. Dr. Norris stated that examination findings were not consistent with the severe level of impairment as reported by Dr. Cadieux or with a degree of functional compromise that would preclude light level occupational activity. Dr. Norris stated that although Dr. Cadieux reported moderate to severe visual disturbance/distortion, physical examinations did not identify consistent impairing ophthalmologic findings to explain her symptoms. Dr. Norris reasoned that diagnostic testing/imaging did not identify structural disease or other pathologic condition consistent with the severity of function of loss reported by Dr. Cadieux. Dr. Norris stated that the level of treatment was not consistent with the severe level of impairment as reported by Dr. Cadieux. Dr. Norris stated that Dr. Cadieux's reported activities did not support restrictions and limitations due to non-behavioral health conditions given her demonstrated capacity to drive, ride a bicycle, perform her occupation at 50-70% capacity, participate in social activities, travel internationally for the purpose of her sabbatical, grocery shop, and paddle board.

124.   Unum also requested that Dr. Marino do another review. Dr. Marino summarized the additional information and concluded that Dr. Cadieux's symptoms were primarily attributable to psychiatric illness. He claimed that there was disagreement between providers with some attributing the symptoms to TBI.

125.   Dr. Cadieux's counsel provided a response to Unum's new information on August 29, 2023, with a detailed letter and additional evidence.

126.   The response letter argued that Unum was not reviewing Dr. Cadieux's claim in a full and fair manner.

127.   The response letter pointed out Unum's inconsistent findings and decision making, first finding that Dr. Cadieux disabled for the period up to her sabbatical based on Dr. Marino's review, and then in contrast, an opinion from Dr. Norris that Dr. Cadieux was not disabled for any period due to her traumatic brain injury, and Dr. Marino now claiming that Dr. Cadieux's symptoms were psychiatric.

128.   The response letter stated that Karen, the Lead Appeals Specialist, had indicated she would contact Hamline University regarding coverage during Dr. Cadieux's sabbatical but that the new information did not include communications with Hamline University on that issue.

129.   The response included an email from Chris Carlson, Benefits Administrator at Hamline University, stating that benefits do continue during the period of sabbatical leave.

130.   The response letter stated that the coverage issue was not relevant to Dr. Cadieux's claim because she was continuously disabled under the LTD policy.

131.   The response letter pointed out that Dr. Marino did not address the arguments in Dr. Cadieux's July 20, 2023, response letter.

132.   The response letter stated that Dr. Norris made many statements that are contrary to the substantial evidence in the record and that he failed to address the arguments made on appeal or the July 20, 2023, response letter.

133.   The response letter noted that Dr. Norris has been a medical consultant at Unum since January 2011 and that prior to that, Dr. Norris was largely in administrative roles in the military. The response included a curriculum vitae for Dr. Norris.

134.     The response letter stated that contrary to Dr. Norris's findings, Dr. Cadieux was treated three times per week for vision training.

135.     The response letter pointed out that when Dr. Cadieux was first seen by neurologist Dr. Abby Metzler in September 2020, the first referral she made was to Dr. Christian Larson for Dr. Cadieux's vision problems. The response letter pointed out objective evidence supporting Dr. Cadieux's visual difficulties.

136.     The response letter pointed out the inconsistencies between Dr. Norris's and Dr. Marino's opinions. Dr. Norris concluded that the level of treatment was not consistent with the severe level of Dr. Cadieux's impairment and that she was not disabled during any period; whereas Dr. Marino stated that Dr. Cadieux received a significant degree of care during the period under review, that restrictions and limitations were supported that Dr. Cadieux was unable to perform her full-time duties and specifically her ability to perform duties on a computer screen.

137.     The response letter pointed out that neither Dr. Norris nor Dr. Marino addressed the medical articles provided by Dr. Cadieux. The response included additional medical articles.

138.     On August 31, 2023, Dr. Cadieux provided two additional records, the complete note from Carlee Beireis, APRN, CNP, dated October 14, 2020, and a medical note from Lisa Holtman, OD, Vantage Point Eyes dated August 25, 2023.  Optometrist Holtman's diagnoses included unspecified disorder of visual pathways.

139.     Unum conducted no further medical reviews. A denial letter was prepared by the lead appeals specialist on August 29, 2023, and approved on September 1, 2023.

140.    Unum issued the appeal denial letter on September 1, 2023. The letter addressed both the LTD policy and the life insurance policy. Dr. Cadieux had never received an initial letter on the disability benefit under the life insurance policy.

141.    The appeal denial letter stated that Unum's psychiatrist on appeal supported the claim that Dr. Cadieux's symptoms were primarily related to post-traumatic psychiatric symptoms. Unum stated that the restrictions and limitations supported by the psychiatrist related specifically to Dr. Cadieux's ability to perform duties on a computer screen including the cognitive demands of the occupation that require use of a computer screen. Based on this, Unum approved residual LTD benefits through August 28, 2021.

142.    For the first time Unum informed Dr. Cadieux that her sabbatical leave was not considered active employment because she was not performing the material and substantial duties of her regular occupation. Unum reasoned that because Dr. Cadieux elected to take sabbatical leave, she was not performing her regular occupation. Unum stated that the LTD policy includes a provision permitting benefits to end if an insured is able to work in their regular occupation on a part-time basis and does not.

143.    Unum acknowledged a note from Dr. Graf in August 2021 and Dr. Kasprzak and Dr. Weisberg in 2022 supporting restrictions limiting Dr. Cadieux to a 50% schedule but took the position that Dr. Cadieux would only be eligible for continued residual benefits if she returned to work. Unum conceded that Dr. Cadieux was residually disabled at the time she took sabbatical leave but took the position that LTD benefits were not payable as of August 29, 2021, because she was able to work part-time and did not.

144.    Unum noted that Dr. Cadieux continued to claim that her disability is due to TBI/post-concussion syndrome rather than psychiatric illness but stated that it was not closing the claim based on the mental illness limitation. Unum went on to state that it concluded restrictions and limitations due to a physical/organic condition were not supported.

145.    Unum's appeal denial letter stated that sabbatical leave is not considered active employment as defined by the LTD policy.

146.    On July 25, 2024, Dr. Cadieux's counsel sent a letter to Unum giving it an opportunity to reconsider its position to avoid the cost, fees, and time of litigation. The letter pointed out that Unum had not contacted Hamline University to inquire whether performing duties as part of an approved sabbatical program was part of Dr. Cadieux's occupational work. The letter pointed out that the LTD policy did not specifically address work and pay under an approved sabbatical program. The letter pointed out that it was nonsensical to consider Dr. Cadieux's sabbatical as not being part of her regular occupation, given the information provided and the fact that she continued to be paid wages by Hamline University at the same rate under her contract.

147.    An email from Chris Johnson, Hamline University, was included with the letter, confirming that duties performed by professors while on sabbatical are part of their occupational duties.

148.    The letter pointed out that Unum had not been prejudiced in any respect by Dr. Cadieux going forward with her sabbatical and that the sabbatical allowed Dr. Cadieux to continue working, since the restrictions before the start of the 2021-2022 academic year

restricted her to no more than two hours of screen time, which would not permit Dr. Cadieux to perform her teaching and related duties on a part-time basis.

149. Unum responded the same day stating that its position remained unchanged.

150. None of Unum's medical reviews considered the actual substantial and material duties of Dr. Cadieux's occupation.

151. Dr. Cadieux has exhausted her administrative remedies.

152. Unum's decision making is not entitled to deference. Dr. Cadieux is entitled to a *de novo* review of her claim.

## CLAIMS FOR BENEFITS DUE
## PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

153. Plaintiff restates and realleges the allegations contained in the foregoing paragraphs.

154. Plaintiff has submitted sufficient proof to support she is disabled under the terms of the LTD policy based on physical conditions. Unum's position that Dr. Cadieux's disability is primarily psychiatric is contrary to Dr. Cadieux's providers' opinions and constitutes a breach of the RSA and Unum's Claims Manual.

155. Unum's position that Dr. Cadieux's benefits should end because she performed work under the sabbatical program rather than her teaching duties is contrary to the LTD policy and the facts.

156. By reason of the foregoing, Plaintiff is entitled to reinstatement of her claim and retroactive benefits under 29 U.S.C. § 1132(a)(1)(B), interest, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

WHEREFORE, Plaintiff Dr. Cadieux requests that the Court:

(1)     Adjudicate that Plaintiff is entitled to continued disability benefits under the LTD policy from August 29, 2021, through the date of the Court's Order.

(2)     That Plaintiff is entitled to ongoing disability benefits until she is no longer disabled under the LTD policy.

(3)     Adjudicate that Plaintiff's disability is based primarily on physical conditions from the date of disability and forward.

(4)     Award retroactive monthly benefits under the LTD policy from the date benefits were terminated plus interest.

(5)     Order that Plaintiff's claim be reinstated and that monthly benefits commence according to the terms of the LTD policy.

(6)     Award Plaintiff her costs, disbursements, and other expenses of this litigation, and reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g).

(7)     Award such additional and further relief as the Court may deem just and proper.

Dated: 08/02/2024                    **NOLAN, THOMPSON, LEIGHTON & TATARYN, PLC**


By: /s/ *Denise Y. Tataryn*
Denise Y. Tataryn (#179127)
1011 1st Street South, Suite 410
Hopkins, MN  55343
Phone:  952-405-7171
Fax:  952-224-0647
Email:  dtataryn@nmtlaw.com

*Attorney for Plaintiff*

31